(164 App. Div. 663)

GILSEY et al. v. LANCASTER. (No. 6235.)

(Supreme Court, Appellate Division, First Department. December 4, 1914.)

1. FRAUD (§ 58*)—WEIGHT OF EVIDENCE.
    In an action on a guaranty of performance of the terms of a lease of a hotel, to recover unpaid installments of rent, defended on the ground of false representations by the lessors as to the former lessee's success in conducting such hotel, and as to the reasons for terminating the lease and the amount of rent which he was paying, evidence *held* to show by the preponderance thereof that no fraudulent representation of a material fact was made, and that defendant, in executing the guaranty, did not rely on any misrepresentation, if made, and hence a verdict for defendant was contrary to the weight of the evidence.
    [Ed. Note.—For other cases, see Fraud, Cent. Dig. §§ 55–59; Dec. Dig. § 58.*]

2. APPEAL AND ERROR (§ 1064*)—ACTIONS—INSTRUCTIONS—FRAUD.
    In an action on a guaranty of performance of the terms of a lease of a hotel, defendant pleaded a fraudulent representation that the rent demanded was the same rent then being paid by the former lessee. Plaintiffs admitted a representation that the lease to the former lessee called for the same rental, and did not claim that they informed defendant regarding a reduction in the rent, which they claimed was made as a concession to secure changes which they were desirous of having the lessee make, but no fraudulent suppression of a fact was pleaded or litigated. The jury, after its retirement, asked the court whether the withholding

of the fact of this reduction constituted a misrepresentation, and the court replied that this was purely a question of fact for the jury to determine. *Held*, that this instruction was reversible error, and the court should have called the jury's attention to plaintiffs' claim that they received a consideration for reducing the rent, and specifically instructed them that a verdict for defendant could be predicated only on a material express false representation alleged, proved, and relied upon, as the jury under the instruction might have thought that the only representation made was respecting the rent called for by the lease, and based their verdict for defendant on the mere failure to disclose the reduction in rent.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 4219, 4221–4224; Dec. Dig. § 1064.*]

Dowling and Hotchkiss, JJ., dissenting.

Appeal from Trial Term, New York County.

Action by Henry Gilsey and others against Frederick J. Lancaster. From a judgment entered on a verdict in favor of defendant, and from an order denying a new trial, plaintiffs appeal. Reversed, and new trial granted.

Argued before INGRAHAM, P. J., and LAUGHLIN, SCOTT, DOWLING, and HOTCHKISS, JJ.

Morgan J. O'Brien, of New York City (Sol. Kohn, of New York City, on the brief), for appellants.

Charles F. Brown, of New York City (Grant C. Fox, of New York City, on the brief), for respondent.

LAUGHLIN, J. [1] On the 1st day of March, 1904, the heirs and executors of Peter Gilsey, deceased, executed a lease of the premises at the northeasterly corner of Broadway and Twenty-Ninth street, including the building thereon known as the Gilsey House, to one Keen for the period of 7 years and 2 months from that day at the yearly rental of $75,000, payable in equal monthly installments, in advance, and Henry Gilsey and others of the lessors executed and delivered to Keen an agreement for the sale and delivery of the furniture and furnishings in the hotel. At the same time the defendant executed and delivered to the lessors an agreement in writing reciting that, in consideration of the execution and delivery of said lease by them and of said agreement for the sale and delivery of the furniture and furnishings, he guaranteed and made himself responsible to the lessors and vendors—

"for the prompt and faithful performance of all the terms, covenants, and conditions in said lease to be kept and performed by said Keen and his assigns, and also for the prompt and punctual payment of the eight (8) certain promissory notes of three thousand one hundred and twenty-five dollars ($3,125) each, given by said Keen in part payment for said furniture, goods, and chattels, and I do hereby waive notice of default or demand."

It was further recited in the agreement executed by the defendant that, after the expiration of 45 days from default in the payment of any of said notes, all of the other notes then unpaid were to become due and payable, but that his total liability should not exceed the sum of $37,500. This action is based on that guaranty of the defendant, and

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

is brought to recover the sum of $37,500, together with interest thereon from the 3d day of December, 1904, on the ground that Keen defaulted in the payment of the rent due on the 1st of May, June, July, August, September, October, November, and December, 1904.

At the time of the execution and delivery of the lease to Keen, one Roessle was in possession of the premises under lease from Keen's lessors for the term of 11 years from May 1, 1900, which provided for the payment of an annual rental of $75,000, in equal monthly installments, and was secured by a deposit of $50,000 in cash and two notes, each for $12,500, with the Knickerbocker Trust Company. Keen was an experienced hotel manager. He had managed the Hotel Marie Antoinette for 8½ years, the Manhasset House at Shelter Island for 2 years, and the Hotel Edgemere for one year, and had severed his connection with the Marie Antoinette in the latter part of the year 1903, owing to the fact that there was a change in the ownership thereof. The defendant was president of the Lancaster Sea Beach Improvement Company, which conducted a hotel at Edgemere during the year 1903 under the management of Keen. Keen was living at the New Hoffman House, four blocks below the Gilsey House, and was frequently in the Gilsey House, and he says he had been there "hundreds of times," and had observed that Roessle had closed the Broadway entrance, leaving an entrance only from Twenty-Ninth street, which appeared to him and to others whom he had heard discuss it to be a mistake, and he was informed, but he did not remember from whom he obtained the information, that the Gilsey House could be leased. On the 15th of December, 1903, Keen wrote Gilsey Bros. & Co., which was a firm of real estate brokers and agents composed of Fred and Peter Gilsey, two of the heirs, stating that he had managed the Marie Antoinette for 8 years, and had a large "following," and was a "thoroughly up-to-date hard-working hotel man," and requested that they advise him confidentially whether the Gilsey House could be leased.

The lessors were dissatisfied with the changes made in the hotel by Roessle, in closing the Broadway entrance and other incidental changes, and that matter and the rent reserved had been the subject of negotiations between them, which resulted in a written modification of the lease on the 29th of May, 1903, by which the lessors agreed to allow a deduction of $6,000 per annum from the rent for two years from March 1, 1903, at the rate of not to exceed $1,500 per quarter, and they agreed to paint the outside of the building at their own expense during the year 1903, and to put in at their own expense revolving doors at the Broadway and Twenty-Ninth street entrances, and Roessle agreed to remove a row of tables from the café, so as to allow and maintain, during the balance of the term, free and uninterrupted passage from the Broadway entrance to the lobby, and to remove from the Twenty-Ninth street entrance telephone booths and desks for stenographers and carriagemen, so as to allow and maintain, for the balance of the term, free and uninterrupted passage from the Twenty-Ninth street entrance to the lobby. Roessle paid the rent in accordance with the lease as modified until the end of May, 1903, and in July he gave a note for part of the rent, and gave other notes for rent dur-

ing the summer of 1903, but apparently paid cash in the fall and paid the December rent in full, the last payment having been made on the 24th of December; but he failed to pay any rent after that date, and notified the lessors in January, 1904, that he could not and would not pay any more rent.

On the 1st of March, 1904, when the lease to Keen was made, Roessle was in arrears for the payment of rent in about the sum of $29,000, which, on or about that day, and evidently when he surrendered the lease, was taken out of the moneys deposited with the Knickerbocker Trust Company as security. Prior to the time Keen wrote the letter, asking if the hotel could be leased, there had been no negotiations between the lessors and Roessle for any further change in the terms of the lease, or for the cancellation thereof, and Roessle testified that he made no effort to vacate the premises or to surrender the lease until the surrender thereof was negotiated in connection with the negotiations which resulted from Keen's letter by which the lease was made to Keen; but Roessle testified that he told "the Gilseys the business could not stand such a rent—the house could not be made to pay that rent." There is other testimony, however, tending to show that early in January, 1904, Roessle opened negotiations with plaintiffs through his attorney for a reduction of rent or the surrender of the lease.

The defendant admitted the allegations of the complaint, and pleaded as a separate defense that, prior to the execution of the guaranty by him to the Gilseys, they knowingly, falsely, and fraudulently, and with the intention of deceiving him and of inducing him to execute the guaranty, made false representations as follows: (a) That the reason why the said Gilseys were willing to release their tenant, Elwood O. Roessle, was because they did not like him personally. (b) That the reason why said Roessle was willing to surrender his lease and the possession of the Gilsey House was because he had an opportunity of acquiring a valuable interest in the Arlington Hotel at Washington, D. C. (c) That the rent of the said Gilsey House demanded from said Keen, viz., $75,000 per annum, was the same rent as was then being paid by the said Roessle. (d) That the business of the said Gilsey House during said Roessle's tenancy had been and was successful and very profitable. (e) That said Roessle has always paid his rent promptly. (f) That said Roessle had paid the cost of furnishing said Gilsey House out of the profits realized from the hotel business in the said Gilsey House during his tenancy. (g) That said Roessle had on deposit in the Knickerbocker Trust Company the sum of $75,000, as security for the payment of the rent of the said Gilsey House, and that the plaintiffs had never had any occasion to resort to or call upon that security fund for the payment of said Roessle's rent.

The defendant further alleges, in the same defense, that the reasons the lessors were willing to release Roessle, and he was willing to surrender the lease, were that they knew that he had become heavily indebted and was in arrears for rent to the extent of $30,000, and was insolvent and on the verge of bankruptcy, and that the rent paid by Roessle was not $75,000 per annum, but was only $69,000, and that

the business had not been successful and profitable during Roessle's tenancy, but, on the contrary, the tenant had lost during the 3 years and 8 months of his tenancy approximately $190,000, and that Roessle had not paid for the furniture of the hotel out of the profits of the business, and that the lessors did have occasion to resort to the security for the rent, and did demand the application of the security to the indebtedness, and that an action was brought by the lessors against Roessle for the recovery of said arrears of rent, and that defendant relied on said false and fraudulent representations.

The evidence adduced upon the trial presented an issue of fact with respect to the making of the alleged false representations, and with respect to the claim that there was a false representation concerning the rent which Roessle was paying. The testimony on behalf of the defendant tends to show that the representation was that Roessle *was paying* $75,000 per annum, and on the part of the plaintiffs that the ony representation was *that the lease to Roessle called for the payment* of $75,000 per annum. The contention on the part of plaintiffs was, and is, that defendant was interested with Keen in this lease, and that both Keen and the defendant were fully aware of the fact that the hotel had not been a success under Roessle, which was his reason for being willing to surrender a lease still having 7 years and 2 months to run, and that they were relying upon Keen's superior ability as a hotel manager to manage and to make the hotel a success, and upon their own judgment as to what was the fair rental of the hotel, rather than upon what Roessle had agreed to pay.

Henry and John Gilsey, sons of Peter Gilsey, deceased, managed the estate for the heirs. Fred and Peter Gilsey were their nephews, and, after receiving the letter of December 15th, called to see Keen at the Hoffman House, but he was not in. The next day he wrote them, making an appointment and giving references, and stated that he had one of the best organized crews of hotel help in the country, and had a large following and "a good reputation for keeping a good hotel," and would have remained in charge of the Marie Antoinette, had it not been leased to a Mr. Woolley, and with reference to his knowledge of conditions at the Gilsey House said:

"Referring to the Gilsey House property, I can see a possibility of a good live man making a success of that house, providing the owners make the rent right. I do not wish to criticize another hotel man, but I have been around the Gilsey a good deal lately and feel confident that there is a good opening there for the right man."

After Fred and Peter Gilsey received this letter they had an interview with Keen, and told him that they would see their uncles and see what arrangements could be made with reference to renting it, and on the 20th of December he wrote them, requesting that they ascertain what Roessle would take for his furniture, and stated that, if Roessle's price for the furniture was satisfactory, he would take a lease of the hotel until May 1, 1911, at $75,000 per annum, on condition that the landlord make certain specified improvements, and therein expressed the opinion that he could make the "property valuable in the face of all the new hotels, and severe competition in the vicinity." Fred and Peter Gilsey conferred with their uncles, and on the

31st day of December, 1903, Keen and one of the executors entered into an agreement in writing by which the executor agreed to lease and Keen agreed to hire the premises from the date when possession could be obtained from the lessee to May 1, 1911, at $75,000 per annum, on certain conditions with respect to repairs not material here. That agreement required the tenant to deposit $75,000 as security, and it was conditioned upon Keen's being able to purchase the furniture and furnishings from Roessle for $50,000. After obtaining this option for a lease, Keen met the defendant and exhibited it to him, and a meeting was arranged between Keen, defendant, and Peter and Fred Gilsey.

With respect to that interview testimony was given by defendant and Keen tending to establish the claim that the misrepresentations alleged were made, which, however, was controverted by the testimony of Fred and Peter Gilsey, who further testified that it was then and there distinctly stated and understood that Roessle had not made a success, and that the only representation made with respect to the rent under the lease to Roessle was in answer to a statement made by Keen to the effect that he had been told that the lease to Breslin—Roessle's predecessor—"called for $72,000," and he wanted to know if Roessle's lease was for the same amount, and Fred Gilsey said, "No; it was for $75,000." It further appeared from the testimony of Fred and Peter Gilsey that they did not have charge of the books of account between the estate and Roessle, and had no information as to some of the facts concerning which Keen and Lancaster claimed they made representations. According to the testimony of defendant, he said on that occasion: "I have no interest in this, and don't expect to have. I am here just to assist Mr. Keen"—and then proceeded to make inquiries which led to the false representations; but he does not state that he was there making inquiries for himself with a view to becoming a surety, or that he so informed them. All of his inquiries would seem to indicate that he was acting for Keen and endeavoring to ascertain whether or not the contract Keen was about to enter into was an advantageous one for him.

It is to be borne in mind that this case depends, not upon whether false representation were made to Keen, or to those acting for Keen in negotiating the lease, but upon whether any material false representations were made *to the defendant* to induce him to sign the guaranty. In this connection it may be observed that, on what is conceded to be the same evidence in all material respects, an issue of fraud interposed by this defendant in an action against him as indorser of a note, brought by Roessle, was determined in favor of the plaintiff and affirmed. See Roessle v. Lancaster, 140 App. Div. 926, 125 N. Y. Supp. 753, affirmed 205 N. Y. 626, 98 N. E. 1114. In an action against Keen for the rent, a verdict was directed in favor of the plaintiffs herein, and the judgment was affirmed; but the judgment was sustained on the ground that the tenant could not retain possession and resist payment of the rent. Gilsey v. Keen, 104 App. Div. 427, 93 N. Y. Supp. 783; affirmed 185 N. Y. 588, 78 N. E. 1104.

Lancaster further testified that a day or two after this interview

there was another interview between the parties substantially to the same effect; but he says "they were then discussing the question of security to be received from Mr. Keen," and that at one of these interviews he asked Peter Gilsey if he had any objection to his seeing Roessle, and on receiving a reply in the negative he called on Roessle, who stated that he had not made up his mind whether or not he would give up the business, but that on his stating to Roessle that he came *in behalf of Mr. Keen,* who was anxious to get the hotel, Roessle stated that he paid $75,000 a year rent and paid it promptly, and that the landlord had never had occasion to resort to the security for the rent, and that Roessle gave him some details with respect to receipts and expenses of the business, and that, after seeing Gilsey again, he wrote Peter Gilsey on January 20, 1904, among other things, as follows:

"I have given the matter careful consideration, and, speaking for myself alone, I am disinclined to become interested, unless I can see that Mr. Keen can successfully work out his plans in the management of the hotel, which I fear he cannot do, if he, at the outset, is going heavily into debt. In other words, I think I would be inclined to take the matter up if you would accept a proposition to lease the hotel at a rental of $75,000 per year, with satisfactory security to you, securing the payment of the rent, and provided you would arrange to purchase the furniture from the present owner and sell it to Mr. Keen at the price you paid for same, he to pay you in installments of not less than $2,500 quarterly. Mr. Keen does not know that I am writing this letter, and it is no part of my intention to say anything which would convey the impression that I am speaking finally for Mr. Keen. I simply want to make my position clear, and if you cannot entertain the proposition as herein suggested, then I must withdraw from the matter, and I leave it with Mr. Keen to do with as he thinks best."

Lancaster testified that a day or two after this Peter Gilsey called at his office and urged him to "take the matter up again and try and put it through for him," and that he stated to Gilsey that he understood that Keen was contemplating borrowing the money to put up as security, and that if that course were pursued he would have nothing to do with the matter, whereupon Gilsey said he thought Keen could get the security, and he said that, if Keen could get sureties, he saw no objection to Keen's going ahead with the proposition, and that he would take the matter up with Keen again, and that after a further interview with Keen he delivered a proposition to Peter and Fred Gilsey, dated January 23, 1904, and that he had not seen John and Henry Gilsey up to this time, but met them shortly after the delivery of this proposition. The proposition which Lancaster thus submitted is in two parts: One is signed by Keen and addressed to the executors and trustees of the estate, and states that he was prepared to take a lease at $75,000 per annum, and to purchase the furniture for $50,000, payable in installments, and to give a bond for $75,000, with sureties, conditioned for the prompt payment of the rent and of the notes to be given in part payment for the furniture. The other part was signed by Lancaster, and likewise addressed to the executors and trustees. The body of it is as follows:

"If the foregoing proposition is accepted by you, I will agree to carry it through on or before February 1st next, or as soon thereafter as possible."

After submitting this dual proposition, and on the same day, there was a conference between Keen, the defendant, Peter and Fred Gilsey, the two uncles, and one Gardner, a relative of the Gilseys, at which the defendant and Keen say that some of the alleged false representations were substantially repeated by one of the uncles; but their testimony in this regard is. controverted by Fred and Peter Gilsey and by Gardner. The uncles died prior to the trial. According to the testimony of the defendant, when this proposition was presented to the uncles, the part of it signed by him contained the word "endeavor," instead of "agree," and the change was made at the suggestion of one of the uncles, and when this was requested he objected, and stated that he could not carry out the proposition, or would not carry it out, "unless Mr. Keen had his sureties," and that he had been given no assurances up to that time that Keen had sureties, whereupon the executor said that there was no risk in the matter, and thereupon made the alleged false representations. Under date of January 25, 1904, one of the executors, in behalf of the Gilsey heirs, accepted said dual proposition, with certain conditions not material to the decision of this appeal. The dual proposition was not consummated, owing to Keen's inability to obtain sureties, which further tends to show that the defendant, at that time at least, was not obtaining information with a view to becoming a surety. The defendant claims, however, that about the 1st of February he met Peter Gilsey and said:

"Mr. Keen has not procured his sureties, and I doubt if I can do anything with this matter, and I don't want to hold it up."

Whereupon Gilsey asked, in substance, why he did not become a surety, to which he replied that the condition of his affairs was not such as to warrant him in taking any added burden that might be troublesome, and that, while he might be willing to help out by contributing a small amount of cash, he would not "take any responsibility for anybody which by any chance should put any burden upon the burdens" he was then carrying. The defendant says that Keen had stated to him that he was anxious "to get the Gilsey House, and stated, if the two houses"—meaning the Gilsey and Edgemere Hotels—"could be run in conjunction, he thought it would be a good thing for both houses," and that when Peter Gilsey asked him to become surety for Keen he suggested a proposition by which a company would be formed to take and operate the Gilsey House and the Edgemere Hotel, and to receive a lease of each and pay the rent of the Edgemere by issuing stock, which he stated would be equivalent to cash, and that the lease of the Edgemere for seven years would be as good as security for $75,000, and that Peter Gilsey promised to present the proposition to his uncles and to let him know; that later on he was informed by Peter Gilsey that the uncles did not exactly like the proposition, but that he thought they would accept it "if, in addition, I would give a bond for $37,500"; that he promised to consider this suggestion, and, after doing so, he and Keen submitted a proposition under date of February 16, 1904, to incorporate a company with a capital stock of $200,000, $100,000 of which was to be issued for a lease of the Edgemere Hotel for seven years, and to have a lease of the Gilsey

House for seven years given Keen on the terms theretofore agreed upon, and to be assigned to the new company for the remaining $100,-000 of capital stock, the lease of the Edgemere Hotel to be assigned by the new company to a trustee as security for the Gilsey estate, and Keen and the defendant to deposit with the trustee $100,000 of the stock of the new company as further security to the Gilsey estate, and the defendant to furnish a collateral bond, to further secure payment of the rent to the Gilsey estate, in the sum of $37,500.

One of the executors then submitted a counter proposition to lease the Gilsey House to both Lancaster and Keen, with other conditions involving in part the lease of the Edgemere Hotel. The defendant says he rejected that proposition and informed the executor that he would not, under any circumstances, sign a lease of the Gilsey House or become liable as a tenant, and that a day or two after they met again and Peter Gilsey suggested that his uncles might waive defendant's signing a lease if he would increase the cash payment on account of the purchase of the furniture, and thereafter a final dual proposition was agreed upon. Both parts of that proposition are addressed to the estate of Peter Gilsey. The first part is signed by Keen, and he offers to take a lease of the Gilsey House, and to assign it to a company to be formed, and to purchase the furniture for $50,000, payable in installments, and to procure as security for the rent a lease of the Edgemore Hotel for seven years, the rent for the Edgemere to be paid by $100,000 of the stock in the new company, and the lease of the Edgemere to be assigned to a trustee named by the estate, with power to sell or assign the lease in case of default in the payment of the rent of the Gilsey House, and to deposit with the trustee $100,000 of the stock of the new company, to be likewise held as security for the rent of the Gilsey House, and to procure a bond in the sum of $37,500, to be executed by the defendant, to secure the payment of the rent and the notes, with other provisions not material here; and the other proposition is signed by the defendant, and is to the effect that, if Keen's proposition is accepted, "I will agree to carry it out on or before March 1, 1904." This dual proposition was accepted verbally and consummated on the 1st day of March, 1904, as aforesaid.

One Anderson, an attorney, who was present at the closing and appears to have been disinterested, testified that he heard the defendant say at that time that "he could not understand the fact that Mr. Roessle had not made a success of the Gilsey House"; and although the defendant subsequently took the stand and denied some of Anderson's testimony, he did not deny that he so stated on that occasion, although he did reiterate that the Gilseys had been telling him for two months that Roessle had been successful there. The Sea Board Hotel Company was incorporated in pursuance of said agreement, and it went into possession of the Gilsey House March 1, 1904, and operated it under the management of Keen until December, 1904, when it was removed by dispossess proceedings for nonpayment of rent. Bankruptcy proceedings were instituted against Roessle in March, 1904, and he was duly adjudged a bankrupt.

On the 22d day of March, 1904, a letter was written by the de-

fendant, as president of the Sea Board Hotel Company, to the Gilsey estate, in which he suggested that the lessors make improvements to the extent of $25,000, instead of in the sum of $10,000, as had been agreed upon, and offering an additional rental of 10 per cent. on the cost of the work in the event of the proposition being accepted. Having received no definite answer, defendant wrote a second letter, as president of the Sea Board Hotel Company, on April 11, 1904, reiterating its former request and presenting an extended argument in favor of it, and stating, among other things, that the period of six weeks of its occupancy showed a loss of from $3,000 to $5,000, and that the former tenant had gone or was going into bankruptcy, with liabilities in excess of $100,000, and that the estate should know, from its knowledge of the management of its former tenant, that the hotel in its then condition could not be conducted profitably, but with the alterations it would become "as popular and profitable as ever before." The letter states, among other things:

"Mr. Roessle's fiasco has hurt the hotel and ourselves as tenants, and it is certainly no part of our desire or intention to make a repetition of his failure and his neglect to pay his creditors."

In the letter it is suggested that, if the estate was not willing to make the further advances requested, it unite with the tenant in procuring another tenant who would be able to furnish the money required.

It is manifest, from the information communicated in these letters, that the Sea Board Hotel Company and the defendant were then in possession of information which showed that some, at least, of the material representations claimed to have been made, if made, were false, and yet neither letter, both of which were written by defendant, contains a complaint that there was any fraud perpetrated on anybody; and this notwithstanding the fact that the tenants then knew that their expectations with respect to the business being successful were not to be realized, and they were ready to surrender the lease without suggesting any claim for damages. On the 13th day of April, John and Henry Gilsey, for the estate of Peter Gilsey, replied to said letters of March 22d and April 11th, by a letter addressed to the defendant as president of the Sea Board Hotel Company, rejecting the proposition and insisting that they would adhere to the provisions of the lease, and offering to confer with respect to the best manner of using the $10,000 in improving the leasehold property. After the defendant received this letter, and on April 16, 1911, he and Keen wrote the Gilseys, on his official letter head as an attorney and counselor at law, as follows:

"Within a few days we have discovered facts which were unknown to the Lancaster Sea Beach Improvement Company, the Sea Board Hotel Company, and ourselves at the time of executing lease of the Gilsey House and collateral agreements. We are advised that upon proof of such facts the court would cancel said lease and collateral agreements. Will you consent to cancel lease, etc., the terms to be amicably arranged? If not, we shall, on Wednesday, April 20th, place the matter in the hands of our attorney, with instructions to take such steps as may be necessary to protect our interests and enforce our rights. We regret being compelled to write this letter, which is sent to you by advice of our counsel."

The defendant testified that in the latter part of March, 1911, which it may be assumed was after the letter of the 22d of March, he was informed by one Biglin that Roessle "went broke" at the Gilsey House and that the Gilseys were carrying him, and that he communicated this to Peter Gilsey the next day, and that Gilsey said that he did not believe a word of it, but believed that Roessle made money there, and when asked whether Roessle had paid his rent, and the same rent that Keen was paying, he answered in the affirmative and said that, if defendant doubted his word, he might come to the office and he would show him the books. Counsel for respondent cites this testimony in his brief, and says:

"There is no question but the defendant learned during the latter part of March, 1904, that the representations made to him by Roessle were false."

But he says that the defendant did not then know that those made by the Gilseys were also false. No evidence was offered in behalf of the defendant showing that he received any information on the subject, prior to writing the letter of April 16th, that he did not have when he wrote the letter of April 11th. It is quite clear, we think, in view of all the circumstances, that the reason the letter of April 16th was written by defendant and Keen was that the propositions made to the Gilseys in behalf of the Sea Board Hotel Company had been rejected, and that it was not based on any facts with respect to false representations discovered after the letter of April 11th was written. We are of opinion that the verdict is against the weight of the evidence in so far as the jury found that any material representation was fraudulently made, and clearly so in so far as they found that the defendant, in executing the guaranty *relied* on any misrepresentation, if made.

[2] We are also of opinion that, owing to an error in the charge, it may well be that the jury did not find that the defendant was induced to sign the guaranty by any express misrepresentation alleged or proved. After the jury retired, the foreman sent a communication to the court as follows: "If it pleases your honor, the jury would like to know: Did the withholding of the fact of the reduction of the rent from $75,000 to $69,000 constitute a misrepresentation?" To which the court replied in writing as follows: "Purely a question of fact for you to determine." The record does not show that this communication was received and answered in the absence of counsel, nor does it show the presence of counsel. It is asserted in the points of appellants, and not questioned, that counsel were neither present nor afforded an opportunity to be present. In this state of the record, therefore, the jury may have found in favor of the plaintiffs with respect to all express false and fraudulent representations alleged, and concerning which testimony was offered, and may have predicated the verdict, not even on the alleged misrepresentations with respect to rent, but on the failure of the plaintiffs to disclose the fact to the defendant that the rent had been reduced for the two years. The phraseology of the request tends to indicate that this is probable. The jury were not justified in refusing to enforce the guaranty on the ground that the plaintiffs should have informed the defendant with respect

to this reduction. No fraudulent *suppression of fact* with respect to it was pleaded or litigated. The claim of the defendant with respect to the reduction of the rent was based upon the alleged false representations with respect to the amount of rent that was paid by Roessle.

The question thus presented to the court indicates that the jury may have found in favor of the appellants on the charge with respect to the express representations, and may have found that the representation with respect to rent was that Roessle's lease called for $75,-000 rent per annum, which, as already observed, was true. The appellants did not claim that they informed Lancaster with reference to the agreement for the reduction of the rent during the two years, which, as they claim, was made as a concession to secure the changes they were desirous of having Roessle make. When this request for instruction on the part of the jury is considered in the light of the testimony, the effect of which has been stated, it is highly probable that the jurors wished to know whether they could relieve the defendant from liability by the mere fact that the appellants failed to inform him with respect to the modification of the lease concerning the rental for the two years. This request was not for instructions with respect to the legal effect of testimony given by either party concerning the representations as to the rental paid by Roessle, if believed by the jury, but was directed to the point as to whether the failure of the appellants, which was conceded, to inform Lancaster on this point, constituted a misrepresentation; and the court in effect instructed them, by the answer to this inquiry, that they might find that it did. That was error most prejudicial to appellants. Any further instruction given on that subject should have been by drawing the attention of the jury to the claim of appellants that they received a consideration for reducing the rent for the two years, and to the claim of the respondent with respect thereto, allowing the jury to find, in view of the claims and of the evidence on which they were based, whether the appellants made a false representation with respect to the rent; and the jury should have been specifically instructed that a verdict for defendant could be predicated only on a material express false representation alleged, proved, and relied upon by defendant.

It follows, therefore, that the judgment and order should be reversed, and a new trial granted, with costs to appellants to abide the event.

INGRAHAM, P. J., and SCOTT, J., concur. DOWLING and HOTCHKISS, JJ., dissent.